Good morning, all. Our first case for argument this morning is Brandt v. Horseshoe Hammond. May it please the Court. Good morning. My name is George Apostolidis, and I'm here today on behalf of William Brandt, the Plant Administrator of Equipment Acquisition Resources, or EAR, the plaintiff and the appellant in this case. This Court should reverse the summary judgment in favor of the defendant, Horseshoe Casino Hammond. This case should go to a jury. The trial court erred in granting summary judgment to Horseshoe Casino, specifically in its finding that Horseshoe had a complete defense to its receipt of $6.7 million in fraudulently transferred EAR funds pursuant to 11 U.S.C. 550B without any fact question for the jury. In doing so, the district court committed reversible error in four ways. First, the district court incorrectly found that the word transfer for Section 550A purposes is only the transfer from the debtor, in this case EAR, to the initial transferee, in this case Sheldon Player or Donna Malone, who I will refer to collectively as Player. This fundamentally misinterprets the word transfer in the Bankruptcy Code. The transfer for purposes of 550 was the transfer from EAR ultimately to Horseshoe indirectly through Player or Malone. Second, the district court failed to consider good faith and without knowledge of the voidability of the transfer avoided, even though Section 550B lays them out as separate prongs of the Section 550B defense. I hope you'll explain the difference to us as you go along. That's my plan. And I can do so now if you want. Go ahead and outline what you want to do. Third, the district court erroneously found that Horseshoe had to have been able to discover the Ponzi-like fraud scheme going on at EAR in order to have the knowledge of the voidability of the transfer avoided. The red flags in this case, which are clear and undisputed in the record, show that Horseshoe had plenty of notice that the funds that Sheldon Player was paying to the casino to pay off his markers for his personal gambling debts were coming from the business, EAR. That was enough to raise a question of fact as to whether or not those transfers could be voidable. And last, there was a motion to compel that we filed, which was ultimately denied by the court. That is subject to a protective order and the briefing covers that, but the way that the trial judge handled that motion to compel was also reversible. On that point, before we go any further, did you ever raise any objection in the district court to the way it was handled? So, the answer to your question, Your Honor, is yes, I believe. Where? What happened in the district court was we appeared for the presentment of that motion to compel. We explained to the trial judge what was going on, and the trial judge cleared the courtroom. Everybody left other than counsel for Horseshoe and I. We went through what the issue was. He then asked me to leave the courtroom. I left the courtroom. I didn't object to that, but what happened thereafter, I never had the opportunity to object to. Did you ever register an objection? We know there are situations where judges need to handle some kinds of discovery issues, ex parte and in camera. It happens. Did you register an objection on the record? No. Okay. That's what I needed to know. Thank you. And the reason that, but, well, we'll cover that later because that's not really the thrust of why this should be reversed. The reason that this case should be reversed are the other arguments that I presented to you, so let me go forward. First, the district court erred in finding that a transfer is just the transfer from EAR to player. The transfer for purposes of this case is the transfer that ultimately ended up in the hands, or the transfers that ultimately ended up in the hands of Horseshoe Casino, $8.2 million worth in a span of two years. Section 101.54 of the Bankruptcy Code defines the word transfer. Transfer for bankruptcy purposes is, quote, each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property. The district court's view on what the transfer avoided was here is very, very limited. The reality is that here the transfer, and we have evidence of this because we had a tracing expert, the transfers here went from EAR to player to Horseshoe almost immediately to the tune of $6.7 million. And so when the court is considering whether or not Horseshoe had knowledge of the voidability of the transfer, it has to look at not the transfer between EAR and Mr. Player, but the transfer or transfers that it ultimately received. I understand that that would be a good argument if you were representing the creditors of Mr. Player. I really am having trouble with this idea that a business that deals with a human being has to be investigating the solvency of that human being's employer. And that's not our argument, and that's where the district court... Why is it? Why not? Why does it not have to investigate what it looks like? It doesn't have to investigate the solvency. The issue is what knowledge Horseshoe had. Again, the knowledge of the voidability of the transfer. Now, what does knowledge of the voidability of the transfer mean? That's really, I think, the crux of your question. Knowledge of the voidability of the transfer doesn't go to the financial state of the debtor. If that were the case, then no subsequent transferee would ever be liable on a transfer like this. Well, that's not quite true, but it's a heavy burden. But go ahead. I think that's what you're trying to do. The issue for knowledge of the voidability of the transfer is whether or not there's knowledge that the money came from the debtor. So Horseshoe is doing business with Mr. Player, but the money that Mr. Player is using to pay off his debts is not coming from Mr. Player. The money was coming from EAR, and Horseshoe had lots of notice that the money was coming from EAR. Let me give you some examples. If I go to a casino, the casino's going to know my money's coming from the United States Treasury. So what? The casino's going to know that your money may be coming from you. If you go to the casino, you get a credit line, you tell the casino that you have $400,000 of income, and you game away $20,000. I wish, but okay. This is all theoretical for all of us. Clearly, clearly. You're dealing with federal judges. Right. $20,000 or $30,000. But what you had here is Sheldon Player going to Horseshoe saying, My income is $400,000 a year, and I'd like a line of credit for $25,000. In the course of the next 18 months, his credit limit was raised to $450,000, and he made transfers in 24 months of $8.2 million. Now, how is it that somebody who has an income of $400,000 is transferring $8.2 million in two years? Horseshoe had some knowledge. The bonded financial case, which is the leading case on dominion and control and the leading case on Section 550B, says that there are some facts which indelibly lead to the conclusion that there are other facts, and there are other facts here which told Horseshoe, which showed Horseshoe that the money was coming from EAR. Well, and then even if that was true, I mean, okay, so let's assume they should have done some investigation of EAR. I mean, none of the equipment's creditors, financial advisors, or outside accountants detected the fraud, and it took the forensic accountants three months to detect there was a fraud there. But the investigation that Horseshoe should have done was not an investigation into EAR. The investigation that Horseshoe should have done was an investigation into where the money came from. So all it would have had to do is say, hey, Sheldon, can you bring us your bank statements? Because we know you're writing us checks out of your bank accounts. And what would those bank statements have shown? They would have shown transfers into his bank account from EAR in the amount of hundreds of thousands of dollars, and then the next day out of his bank account to Horseshoe. That's the kind of notice which tells Horseshoe that the money is coming from EAR, that transfers could be voidable. But that's not all there was here. Could be voidable under what circumstances? If EAR is insolvent, right? Correct. And how were they supposed to know if EAR was insolvent when, as Judge Williams points out, FTI Consulting, which had full access to EAR's books, couldn't find it for three months? Horseshoe doesn't have to know that EAR is insolvent. Horseshoe doesn't know that EAR has to be on the edge of filing for bankruptcy. Horseshoe doesn't have to know that EAR is a Ponzi scheme or is a fraud. All Horseshoe has to know is that if the money's coming from somewhere other than its customer, there's the potential that that money is avoidable because he's taking money out of the company that he shouldn't be taking out of the company or he couldn't be taking out of the company. You're jumping past the logical obstacles to what you're saying. The logical obstacle, though, has to be coupled with other facts that were in front of Horseshoe. He's a fishy gambler, and there's no question about that, at least for these purposes. But I just don't see how you avoid the need to show knowledge or at least the ability to figure out that EAR was insolvent because otherwise those transfers aren't avoidable. And you don't know if it's insolvent unless you understand the fraud in the underlying business, which was very hard to figure out. That puts, in our view, an incredibly onerous burden on any trustee who's trying to recover. Well, wait a minute. You want to talk about burdens? You represent the creditors who chose to do business with Mr. Player and his business, right? Yes. They chose to do business with a crook, right? They didn't know he was a crook, but he was a crook. No, they didn't know he was a crook. Horseshoe didn't know he was a crook. They thought he was a fishy gambler. They were on notice of that. But they didn't know he was stealing money from EAR. Well, I would argue that actually they did. They knew that he was stealing money from EAR, and they knew that he was a crook. And where do you get that on this record? I get that on this record because Horseshoe has internal controls which identify certain activities that are indicative of criminal activity. Because remember, we're not dealing with the car dealer that's discussed in the bonded case where there's a concern that someone walks into a car dealership, buys a car, and then the car dealer shouldn't be mulked, is the word that the bonded case uses, for that money. This is a casino which is highly regulated and, as our experts pointed out, and it is in this record,  and so it is highly regulated. And so that's part of why Horseshoe periodically ran credit checks and determined that Player and Malone had excellent credit. You know, if they had, you know, all the payments came from personal accounts and if Horseshoe had investigated that, they would have determined that the account was a personal account. So I would respond to that in a couple ways. First, the investigations that they did showed that both Player and Malone lied on their credit applications because those two individuals indicated that they had approximately $490,000 of debt when the credit check that was run the next day by the casinos showed that actually they had six times that. As far as the money coming from personal accounts, there was a big issue made in the district court decision with regard to one account from which two checks came, and that was the Charter 1-9808 account. And the district court concluded that because the Charter 1-9808 account was a personal account to Donna Malone, even though it said Donna Malone EAR, that it was a personal account. Horseshoe's own records say, Charter 1-9808 is a business account, do not accept. So whether or not that account was actually a personal account of Donna Malone's or an EAR account doesn't matter. What matters is that Horseshoe thought it was a business account, and Horseshoe took money from that account. Horseshoe thought it was taking corporate money of EARs. That's the $30,000. That's the $30,000, that's right. Can I just ask you one question? Do you refer to a reference account? Yes. What is a reference account? So at some point, so let me go back and give you a little bit of the facts here. Mr. Player provided when he applied for credit and when Horseshoe checked on the status of his checking accounts, he provided a checking account. And the reason he provided a checking account to the casino is that, and I only learned this through this case, the process of taking out markers from a casino is essentially, you go to the casino, you sit down, if you have a line of credit there, you say I want $20,000 worth of chips. You sign a piece of paper which is a check against your account because you've given the casino access to your account. You've told them what the account is. The casino then takes that piece of paper and it holds it for 30 days. And if the chips that are borrowed are not paid back in the 30 days, the casino can go and deposit that check into its account. What happened here was when the casino checked Mr. Player's personal checking account, it showed that he had balances between $10,000 and $50,000. What's the problem? At the time that it did that, it had extended him credit of $450,000. And up to this trip only of $520,000. So what did Horseshoe want? It wanted a reference account. It wanted to know what other accounts were out there. And what did Player give them? An EAR account. That was the reference account. Further evidence that Horseshoe knew that the money here was coming from EAR and not coming from Sheldon Player. He didn't give them a second checking account. He didn't give them an account with any investments or anything like that. He gave them an EAR account. So when you talk about what notice Horseshoe had, that the transfers here were voidable, Sheldon's saying to them, in effect, Hey, look, if I don't have enough money in my checking account, I've got this corporate account that I can take money out of. What better evidence of voidability do you need than that? Let me ask you this. If we don't agree with you that there was a direct transfer from equipment to Horseshoe, can you still prevail on another theory? Can you ask that one more time? I want to make sure I understand it. I said if we don't agree with you that there was a direct transfer from equipment to Horseshoe, can you still prevail on another theory? Absolutely. Because there's nothing in this record to contravene the fact that the transfers here were avoidable transfers of EAR assets. Our tracing experts showed it. Horseshoe didn't even challenge it on summary judgment. All that's before you is whether or not summary judgment was appropriate on the question of whether Horseshoe took in good faith and without knowledge. Now, I know Your Honor wanted me to distinguish between the two, and I'm into my rebuttal time, but I think it's worthwhile to make the point now before I sit down. We talked about knowledge. Horseshoe had knowledge. Player walked with chips. Player passed chips. Those are both indicative of structuring. Player gambled far more than he had in his checking accounts. But let's talk about what good faith means. Good faith in the law generally deals with commercial reasonableness. So the question is, did Horseshoe... Good faith and without knowledge of the avoidability of the transfer are two separate elements. They both hinge on knowledge. But one, I think, good faith goes to the question of what a reasonable casino in a similar situation would have done. And our expert witnesses are very, very clear, Professor Rose and Mr. Sedillo, that Horseshoe should have stopped doing business with this guy. But they continued to take his money. They continued to want to take his money because he was one of the biggest players in the casino. And by doing that, they ran the risk that they were going to... that the funds could be recovered from them. They didn't care where the money came from. Horseshoe wanted the money from this guy. This is Hammond, Indiana. This is not Las Vegas. $8.2 million in 24 months is a lot of money for this casino. So they buried their heads in the sand and didn't care about any of this. I just have one question about your reply brief, that footnote 3, where you talk about the judgment that was recovered in the amount of $18 million. So have you recovered the money you're seeking now? You say it really, they're not at issue in this appeal. Is it a judgment but no payment, or does the footnote concern transactions that were not subsequently transferred to Horseshoe? So those... The answer to your question is we have not recovered the money. That's the short answer to the question. And this amount relates to the $18 million? This amount may be part of the $18 million, but we haven't recovered any of the $18 million on the judgment that we got against Mr. Player. So we're seeking it from wherever we can get it. Okay, thank you. May it please the Court. The standard that Mr. Brandt has just articulated, that a party is liable as a subsequent transferee whenever you know that the money came from some other person or entity, would turn Section 550b1 on its head. For most of us, except for a small class of independently wealthy individuals who don't have to work, our money comes from some other place. We have an employer, we have a job, we have a business from which we earn our income. Knowing that the party is using money that they've received from their employer is not a reason to find that they had knowledge of the voidability of the transfer if their employer subsequently goes bankrupt. Instead, what this Court held in Bonded Financial, the Seminalist Council says the leading case on Section 550 and 550b1 is that we need to look to see whether they had knowledge of the voidability of the transfer that was made by the debtor to the initial transferee. The facts in Bonded are very nearly identical to the facts in this case. In fact, they're probably far worse for the defendant in that case than they are here. In that case, the bank received the check from the debtor to the individual. It actually received the check and it was told to deposit the check in the individual's account. So they knew that a $200,000 check was being issued to that individual and the bank put it in his account. The individual then instructed the bank to take the money and apply it to a personal loan. And the Court held that there are limits on the pursuit of financial fraudulent transfers and it didn't allow for the recovery against the bank. And the reason why it did that is it concluded that the bank had no reason to know that the company was insolvent. It looked at whether and what the bank knew about the financial peril that the debtor was in and found it did not have any knowledge. And then it looked and said, is there any reason to believe or know that there was some fraudulent activity that was taking place at the debtor to cause it to make fraudulent transfers to its principal? And the Court found that there was no such knowledge but that even if there were, had there been an investigation, just like the District Court judge did here, had there been an investigation, there would not have been anything that would have been found out. What they would have found out was that the check was issued by the corporation and authorized by the controller of the corporation. Here, the facts are virtually the same. EAR was a stranger to Horseshoe Hammond. Horseshoe Hammond had no business dealings with EAR. It was not a creditor of EAR. The payments came from Mr. Player and Ms. Malone and they came from their personal accounts. There's no dispute about that. And even that EAR bank account, even though it says that, the name, that wasn't actually a personal bank account. Yes, it was. What the evidence shows about that, Your Honor, is that Ms. Malone, when she and her husband, Mr. Player, set up EAR, originally it was not a corporation and they operated it out of their home and they set up, she set up a personal bank account and they titled that account, Doing Businesses ERA. Eventually, they incorporate ERA, they move it out of the home and that had been many years earlier. She had not used that account for business purposes in many years and it had never been owned by EAR, the corporate debtor, the entity that is the debtor here. And so what the district court found, because the argument they made below about that account was a little bit different, they claimed that was a transfer from the debtor and the court rejected that. The district court found that no, that wasn't the debtor's account. It was never owned by the debtor. And so Horseshoe was not the initial transferee. It could claim the benefit of a good faith defense under 550b1 as a subsequent transferee. And the court held that had Horseshoe investigated that account further, it would have been told by Ms. Malone, as Mr. Brandt himself argued in litigation he had with Ms. Malone, that this was a personal account. She hadn't used it in many, many years for the business and it's where her salary and other funds that she received were deposited. So it was not a business account. Steve, could you address this question about the reference account that Mr. Player provided? Yes, in his credit application he gave a reference of ERA and that account. He didn't put up that account as backing for the markers. It never was an account from which Horseshoe could draw should Mr. Player have failed to satisfy his obligations under a marker. And in fact, Mr. Player had... So what did it tell the casino? It told them that EIR had money in its bank account. That's what it told them. Remember, he represents that he's the owner of EAR, Equipment Acquisition Resources. He's a business owner. He provides a credit application that shows he owns this business, he and Ms. Malone, and that he has other rental properties from which he gets income, and that he's a very wealthy individual. That's what he represents. His credit reports check that out. And in fact, until the very end, Mr. Player and Ms. Malone always paid their debts on time. They did what they were supposed to do, which is they paid their debts when they were due. There was only just one or two instances where they were late and the casino called them on it and they made good on the debt. There was no reason to believe... There's this discussion here in the presentation about, well, what is it they had to know about EAR? Typically, with a fraudulent transfer, you either know that the debtor, EAR, was insolvent, was in some financial peril, as the court put it in bonded financial, or you know that there's some fraud afoot at the debtor that is causing it to make fraudulent transfers. Here, Mr. Brandt's contention is that the reason why the payments  were fraudulent transfers is because there was a fraud, that because EAR was engaged in an equipment leasing scheme where it was double and triple pledging collateral to various banks, that every payment they received was a fraudulent transfer. So the thing we needed to know about was whether or not there was any indication of fraud at EAR, and we had no knowledge of that, and no knowledge of any facts that would put us on inquiry notice of that. And that's why the district court judge granted summary judgment here. And what about if counsel indicated there were misrepresentations that they made on the documents? The one misrepresentation that he points to is Mr. Player in his initial credit application indicates he has $400,000 of mortgage debt when the credit report that Horseshoe ran showed that he had $2 million of mortgage debt. And the credit policy of Horseshoe Hammond, which was in the underlying summary judgment record, is a credit policy approved by the state of Indiana, and it actually contemplates that situation. If there are inaccuracies in the credit application, which is not uncommon, that does happen. People sometimes do understate their liabilities or misstate them, make a mistake about them. The casino has the discretion, based upon what it determines from the credit check, payment histories that they can see that that individual makes to other parties, what their credit rating is, to extend credit anyway. And so initially, they extend a small amount of credit, $25,000, notwithstanding that discrepancy in the liabilities. They updated the credit check every step along the way, and each time it came back that he had a sufficiently good credit rating to continue to have credit extended to him. But the important point about all of these things that he talks about about Mr. Player's conduct is that none of this is information about the debtor EAR, and that's what's pertinent under the statute. Council points to the broad definition of transfer. Yes, the definition of transfer is broadly defined, but if you look at 548 and how it interplays with Section 550, what is important is that the transfer is made by the debtor. If you start with 548, which is the provision that allows Mr. Brandt here to avoid a fraudulent transfer, the statute uses the language that the transfer is made by the debtor. What it says is, is if the debtor voluntarily or involuntarily made such transfer and incurred such obligation with an actual intent to hinder, delay, or defraud creditors. We only avoid, we may define transfers broadly, but it's limited by the fact that the debtor is the one under 548 that has to make the transfer. And then you move over to Section 550, which is the recovery provision, and that provision is entitled Liability of Transferee of Avoided Transfer. The avoided transfer is the transfer made by the debtor under Section 548. And the text of 550 carries through with the title that's given in that particular provision. And it talks about the fact in 550A that except as otherwise provided in this section to the extent that a transfer is avoided under, and it lists all the various avoidance provisions, including 548, the trustee may recover for the benefit of the estate the property transferred. So we're looking at what the debtor transfers over to the initial transferee. That's the avoided transfer. That's what 550B1 is referring to when it talks about knowledge of the avoidability of the transfer avoided. The only transfer that can be avoided is the transfer that is made by the debtor over to the initial transferee. And that's what the court did in bonded financial. When it looked at what the bank knew, it looked at what the bank knew about the financial peril at the debtor. Was the debtor insolvent? Was the debtor engaged in some fraud when it transferred that $200,000 check into the account of its principal? The same issue is present here. What did Horseshoe Hammond know about EAR when it made these payments over to Mr. Player and Ms. Malone? And none of the things that they talk about, the red flags that they talk about in their brief, have anything to do with EAR's solvency or insolvency or the fraud that occurred there. None of those things, and their own experts, their gaming experts testified that none of that would have put a casino on notice, that there was some problem at EAR that created a fraudulent transfer. And if we look just briefly, looking at those things, there's a lot made about all this in the suspicious activity, but a lot of the things that they point to, really there wasn't much support in the record. The district court judge credited it and said, let's look and see what would happen if we investigated and gave them the benefit of the doubt there, but really they shouldn't have even have gotten that. This passing chips, all that means is that you go to the casino with someone else and you let them use some of your chips. It's not illegal activity. Every gaming expert said it was not illegal activity. It's only a problem if you hide the fact that you're doing it and when your party that you gave the chips to goes to cash them in, they try to contend that they didn't get them from you. Then it can be evidence of structuring. There's no evidence in the record that that's what Mr. Player did here. The testimony they cite from Mr. LeBron in their brief is somewhat not complete in the sense that Mr. LeBron went on to testify that he never saw Mr. Player pass any chips and the only way he even said that he had heard that was because an employee mentioned it to him and he didn't know which employee had mentioned it to him or when. So there's really no foundation for that. Walking with chips, that's taking the chips home with you at night. These chips aren't capable of being used any place other than Horseshoe Hammond. You can't take them to another casino or to a bank and get money for them. If you're ever going to turn them back into cash, you've got to do that at Horseshoe Hammond. So are there $6 million worth of chips missing? No, there was not, Your Honor, because their expert, as the district court judge notes in his opinion, their expert did that calculation looking only at the cash transaction reports that go to the government whenever there's a cash transaction over $10,000. So it missed every single time he turned in chips in an amount under $10,000. It's an incomplete analysis. Are any missing? I'm not sure I know the answer to that, Your Honor. There probably are some missing because, for example, people at casinos give tips to the people that somebody brings you something to eat or to drink. It's not uncommon to give a chip to the waitress or whoever that serves you. And so you can have missing chips. There's nothing in our records, nothing that was produced, nothing in the summary judgment record that suggests that there's some massive amount of missing chips here. What you have is an incomplete analysis by an expert who didn't consider everything, and the district court judge didn't credit it. I assume a casino tries to keep track of that. Those outstanding chips are liabilities for them, right? Yes, they try to keep track of the chips. They want to know where their chips are, yes. So if you've got millions of dollars outstanding somewhere, that's going to have a pretty significant impact on your bottom line as reported, right? I don't know that that would have a significant impact on their bottom line, but it would be something that would be noted in the record. There's nothing in the records of Horseshoe Hammond. I can't tell you exactly how many chips were missing over the, you know, 2 plus 4 years that he played at the casino. What I can tell you is there's nothing in the records that indicate that he is missing chips in any kind of significant amount or really in any kind of amount. That was an incomplete analysis. It really was a red herring, and the district court judge didn't credit it because it was obviously incomplete on its face because there were many instances where he would have cashed in chips that were less than $10,000, probably more so than when he cashed in and it was over $10,000. So these things really are about Mr. Player. They're not about EAR, and so they really aren't relevant. But the real point of the court's decision was that if you had investigated here, what would you have found? You would have found, had you gotten audited financial statements for EAR, you would have seen that this was a very solvent business. Public accounting firms had reported that they had substantial equity, substantial shareholder equity, in excess of $40 million of shareholder equity, substantial value on their assets, that they were earning and making a very good profit in that business. Had you asked for some type of an accountant financial statement for the individuals, Mr. Player and Ms. Malone, there were compiled statements by the same public accounting firm showing them to have very substantial net worth in excess of $30 million, consistent with what they put on their credit application, that in addition to working at EAR, they owned a number of rental properties from which they would have received income and the like. You would have looked and you would have seen EAR's creditor list, had you asked to find out who was doing business with them, and you would have seen large companies like IBM, Hewlett-Packard, Fifth Third Bank, Citicorp, U.S. Bank Corp., all of these parties were financing the equipment leases that EAR was vending, and none of them were saying there was a fraud. They were all doing business with Mr. Player's company, EAR. Without question, these creditors had the right in their loan documents to look at the underlying books and records and didn't see anything. And then you have the whole situation with FTI, where Mr. Player brings them in to try to convince the creditors to enter into forbearance agreements. They're there from July until the end of September. They have a meeting with all the creditors where they say they've had access to all the books. Horseshoe's not invited to this meeting, doesn't know anything about it. But at this meeting, undisputed, FTI says, I've got access to the books. They don't report the fraud. They don't actually even uncover that there's a problem until a week or so later. And then it doesn't become public, really, until the bankruptcy is filed, and it becomes clear that there was a fraud here. And at that point, Mr. Player and Ms. Malone had stopped paying Horseshoe for several months. And so there never was a point where that information was known publicly, where they could have acted on it and stopped doing business with them. On the final point of the due process point, yes, the situation was waived. There was no objection made at the hearing. And we would point out that there's really no prejudice here. The district court judge adopted the legal standard advanced by Mr. Brandt, that the only thing that was not producible were suspicious activity reports themselves and documents prepared solely for the purpose of creating the suspicious activity report. The court then got the factual information under seal. That's the only way you could get it, consistent with the Act, and denied the motion. So one of two things was determined. Either there were documents, but they only fell under the restricted categories, or there were no documents. He wasn't prejudiced. It's not as if he was denied access to those things that the district court said could be produced. Documents prepared in the ordinary course of business. And we, in fact, did produce substantial documents. So we would urge that the court affirm and reject the argument that there was any due process violation here. And we would also urge the court to affirm on the summary judgment under Section 550B1. Thank you, Mr. Chief. Thank you. Mr. Pasolidis. Mr. Pasolidis. Yes. Tell me of the red flags, which one would you say is the strongest indication to harshen of corporate malfeasance? Of corporate malfeasance? Yeah. The walking with the chips, obviously, may or may not be. I mean, it shows he's an erotic gambler, right? It does. So his erotic gambler is not enough, right? That doesn't equal notice of corporate misdeeds, right? I would say it does, and I'll tell you why. And if I may, let me give you two red flags that I think are indicative of corporate malfeasance. One is the sheer volume of the transfers here, $8.2 million, when Horseshoe has a reference account from EAR and knows the player doesn't have enough money to cover all of this gambling debt. The fact that money can simply flow from the company to Horseshoe through Mr. Player is enough for Horseshoe to be on notice that there's corporate malfeasance at EAR. Mr. Player wrote 48 checks in excess of that. He's the owner of the company. He can take money out as long as it's solvent, right? Maybe. This is a guy who reported $400,000 of income and wrote 48 checks in excess of $100,000. Yeah, well, look, he owns the company. He gets to decide what money stays in the company. I'm putting aside all the fraud, which apparently nobody knew about. But in that situation, you've got a profitable company, and the owner gets to decide how much he takes out in salary and how much stays in the business, and it's between him and the IRS, right? No, it's not between him and the IRS only because if a casino, which has been doing business with this guy for a long time, knows that he's structuring, knows that he's doing things which are indicative of federal crimes, continues to accept payments from him that are in excess of what he makes, and it knows the money's coming from the company, that's indicative of corporate malfeasance. Now, I want to point out that the district court opinion had a footnote 6, which had three of what the district court acknowledged were circumstances that would give rise to a casino's duty to investigate. One is a warning that a particular customer might be laundering money. Horseshoe had that. This idea that, well, we're not sure if $6 million in chips disappeared is malarkey. Horseshoe tracked this guy's play, and it tracked his play through his gaming card because he wanted the rewards that came with losing all this money at the casino. Horseshoe's gaming card reports showed that he lost $1.9 million in 2007, 2008, and 2009. If he's losing $1.9 million, why is he writing $8.2 million of checks? It's because he's laundering money through the casino. They had knowledge of it. Mr. Setio, our expert, went through Horseshoe's own records to determine, independent of that, that $6 million in chips disappeared. So the district court says, on the one hand, if the casino has evidence that there's money laundering going on in its casino, that can be something worth noting, and that can be something which would give rise to a casino's duty to investigate when there was money laundering going on here. Number two, the receipt of a corporate check. As I've indicated to you, Horseshoe thought it was getting corporate checks from EAR. And third is erratic gambling behavior. And I think all three of you have at some point... Yeah, Mr. Fosley, so take the red flags and say they point to trouble. The district court seems to suggest that it would be virtually impossible for Horseshoe, at that point, taking the red flags to look to EAR and find something's wrong. Now, why is that analysis by the district court wrong? What could they have found? What the district court would have... Well, let's look at what the district court focused on. The district court focused on, again, the situation at EAR, as counsel has focused on the situation at EAR. Was it a solvent company? Was it pulling the wool over people's eyes? Did it have an independent auditor? But that's not the standard under bonded, or I would argue to you, under the statute. The standard is not knowledge of what's going on at the debtor. The standard, again, is knowledge of the voidability of the transfer of money. But how do they gain the knowledge of the voidability if there's not a transparent observation of corporate malfeasance? In one sentence, it's because they knew he was stealing money. They knew he was stealing money from the company. That's the answer to your question. That's what they had in front of them. That's what they knew. How do you tell the difference between stealing money from a company and simply, as the owner, compensating yourself? You don't. But if you continue to take money from the company, you run the risk that if it turns out that that money is stolen, you're going to have to give it back because that's the good faith part of this. Should Horseshoe have continued to do business with this guy knowing that he was transferring huge amounts of money from the company to Horseshoe? The answer is you run the risk. You're choosing to do business with this guy with notice that there's potentially a problem here. That's your risk. If it turns out that the money is simply, as you say, from a solvent company transferred by the owner, then hey, you get to keep it. That's great. But if you continue to do business with him on these facts, on this record, you know he's laundering money, you know he's stealing, you know he's structuring. At what point, if we could look at this in a temporal sense, at what point would you say that clicked in? Obviously not the first time he seemed to spend more than his credit would seem to indicate. So where should we see that imputed knowledge come to Horseshoe, if we could? That's an excellent question. The checks from Donna Malone EAR were in 2007, early 2007. So I'd argue to you that from that point forward, potentially, all the transfers are taken at risk by Horseshoe. It's into the middle of 2008 when he starts making these huge transfers in humongous chunks, $100,000, $150,000, $200,000 checks. There were 11 checks that he wrote over $200,000. And there's one more thing that I want to point out to you with regard to corporate malfeasance and structuring and money laundering. This guy would go in, he'd buy $50,000 of markers one day, he'd lose $10,000, and then the next day he would come in and he'd take another $30,000 in markers out. Why would he do that? He's only lost $10,000 of the $50,000 he was given the day before. He's got $40,000 supposedly in chips sitting in front of him. Why does he need to take out more? You couple that with the fact that the chips were missing, had disappeared, and that's enough to show this casino that this man was money laundering. Thank you very much. All right, thanks to all counsel. The case is taken under advisement.